IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

WOLF RESOURCES, LLC,

       Plaintiff,

v.

CODY DERNER,
COREY LINTON,
COLORADO REAL PROPERTY SOLUTIONS, LLC, and
CORE WEST ENERGY, LLC,

       Defendants.

**COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff Wolf Resources, LLC ("Wolf"), for its Complaint for Injunctive Relief ("Complaint") against Defendants Cody Derner ("Derner"), Corey Linton ("Linton"), Colorado Real Property Solutions, LLC ("CRPS"), and Core West Energy, LLC ("CWE") (together, "Defendants"), states as follows:

**<u>INTRODUCTION</u>**

1. Wolf requires the assistance of this Court to protect its business operations and trade secrets. Forensic analysis has confirmed that two former employees and their entities have absconded with thousands of confidential and trade secret files belonging to Wolf, including documents at the very core of Wolf's business of dealing in oil and gas mineral interests, despite their representation that they had returned all Wolf information. And just last week, Defendants

attended a major industry conference focused on the exchange of oil and gas mineral interests. Defendants' theft of Wolf's proprietary information, and their involvement in a key industry event, confirms that, in addition to violating their confidentiality restrictions with Wolf, they are violating or will imminently violate their non-solicitation and non-competition restrictions. Wolf will be immediately and irreparably harmed if it does not obtain injunctive relief as requested herein.

## PARTIES, JURISDICTION, AND VENUE

2. Wolf is a Colorado limited liability company with its principal place of business at 621 17th Street, Suite 1601, Denver, CO 80293.

3. Derner is an individual who resides at 5436 Prentice Circle, Littleton, CO 80123.

4. Linton is an individual who resides at 17562 West 77th Drive, Arvada, CO 80007.

5. CRPS is a Colorado limited liability company with its principal place of business at 5436 Prentice Circle, Littleton, CO 80123.

6. Derner is the sole member of CRPS.

7. CWE is a Colorado limited liability company with its principal place of business at 17562 West 77th Drive, Arvada, CO 80007.

8. Linton is the sole member of CWE.

9. The Court has original jurisdiction over this matter under 28 U.S.C. § 1331, as this action alleges a claim arising under the laws of the United States. The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

10. Venue is proper in the District of Colorado pursuant to, *inter alia*, 28 U.S.C. § 1391(b)(1), because Defendants are residents of Colorado.

## GENERAL ALLEGATIONS

A.    **Wolf's Business and Trade Secrets.**

11.    Wolf is a privately-held company engaged in the acquisition, holding, exchange, and selling of oil and gas mineral interests.

12.    Wolf has invested substantial effort, time, and money in developing and maintaining its confidential information and trade secrets.

13.    Wolf's confidential and trade secret information includes, without limitation, purchase and sale agreements for mineral interests, lists of information regarding mineral interest owners, pricing formulas and methods, deal sheets listing pending deals, and executed subscription agreements.

14.    Wolf's confidential and trade secret information also includes mineral ownership and leasehold reports ("MORs"), drilling title opinions ("DTOs"), division order title opinions ("DOTOs"), and related documents.

15.    The MORs, DTOs, and DOTOs are the backbone of Wolf's database of potential deals for oil and gas mineral interests; they provide the key information Wolf has gathered on mineral interest owners in relevant areas, including verification of the ownership of the interests and other information.  These are the most labor-intensive documents produced by Wolf, as they frequently require dozens of hours of research, including travel to remote locations to access county records.

16.    To protect and preserve its confidential information and trade secrets, Wolf uses a firewall, antivirus and internet security software, employee activity monitoring software, physical safeguards, and nightly server backups.

17. Further, remote access to Wolf systems is granted only to authorized users, and folders on Wolf's server are protected by access/permission rights assigned by Wolf's management team.

18. Wolf further protects its confidential information and trade secrets through the use of restrictive covenants and by initiating litigation, such as this lawsuit, when necessary.

19. Wolf's confidential information and trade secrets provide it with a business advantage over competitors that do not have access to, or knowledge of, the confidential information or trade secrets.

**B.    Defendants Begin Working With Wolf and Agree to Confidentiality, Non-Solicitation, and Non-Competition Provisions.**

20. Derner's entity, CRPS, became a member of Wolf in 2017.

21. Derner had been providing services to Wolf or Wolf's predecessor entity since approximately 2014 and continued to provide services to Wolf when CRPS became a member of Wolf.

22. Linton's entity, CWE, became a member of Wolf in 2017.

23. Linton had been providing services to Wolf or its predecessor entity since approximately 2014 and continued to provide services to Wolf when CWE became a member of Wolf.

24. While at Wolf, Derner held the title of Vice President of Acquisitions.

25. While at Wolf, Linton held the title of Vice President of Asset Management.

26. CRPS and CWE, through Derner and Linton, respectively, signed Wolf's Third Amended and Restated Operating Agreement ("Operating Agreement"), which is dated effective March 1, 2018 and is attached hereto as Exhibit A.

27. Derner and Linton had signed a prior version of the Operating Agreement in their individual capacities, but Wolf accommodated their request to have the agreement redrafted so that CRPS and CWE would be signatories.

28. CRPS and CWE agreed to a confidentiality provision, which defines "Confidential Information" as follows:

> Each Member acknowledges and agrees that any and all information, data, know-how, trade secrets (as defined in C.R.S. § 7-74-102(4)), designs or work product acquired, gained, developed or uncovered by the Company during the conduct of the Company's Primary Business (collectively "**Confidential Information**") is the absolute property of the Company, and the Company is the sole owner of the Confidential Information. The Confidential Information includes, but is not necessarily limited to, mineral deeds, title research, ownership lists, contracts, written files, computer data, financial information, reports, business strategy, and work product.

Exhibit A § 24.3.

29. CRPS and CWE agreed as follows with respect to the Confidential Information:

> Each Member acknowledges that to the extent such Member acquires, obtains or has access to any Confidential Information such Member does so in strict confidence and if so requested by the Company after ceasing to be a Member of the Company, such Member shall return all Confidential Information in its possession to the Company. Independent of the termination of this Agreement, each applicable Member shall keep confidential and shall not divulge, communicate or use to the detriment of the Company any Confidential Information. The foregoing shall not apply to information and data that is readily available to the general public, unless such availability is due to such violating

>Member's actions.  This Agreement shall not prohibit or limit the disclosure of Confidential Information that is required to be disclosed under any state or federal laws.

*Id*.

30. CRPS and CWE also agreed to an additional confidentiality restriction (this additional restriction, together with the confidentiality provision in Section 24.3, the "Confidentiality Provisions"), as well as a non-solicitation provision ("Non-Solicitation Provision"):

>During the Restricted Period, except as the same relate to an Exempt Company, no Member or Restricted Party shall directly or indirectly through another Person (a) influence or attempt to influence any of the sellers, buyers, clients, customers, suppliers, licensees, licensors, sponsors or other business relations of the Company to divert their business or patronage from the Company to any other Person engaged in any of the Company's Primary Business Areas or to cease doing business with the Company, or in any way interfere with the relationship between any seller, buyer, clients, customer, supplier, licensee, licensor, sponsor or other business relation and the Company; (b) disclose to any Person the names, addresses, or requirements of, or other Confidential Information or trade secrets relating to, any of the Company's Primary Business Areas including, but not limited to, the form of purchase or sale agreement for mineral interests, client or customer lists or other information on mineral owners, investors and pricing formulas or methods used in any of the Company's Primary Business Areas; [or] (c) make any statement or do any act intended to cause [an] existing or potential seller or buyer of mineral interests to enter into an agreement with any competitive business…. Specifically, a Member or Restricted Party shall not: . . . (iii) attempt to or participate in any way, directly or indirectly, in soliciting, inducing, or encouraging any seller, buyer, client or customer, or any prospective seller, buyer, client or customer, to become a customer or client of any other person, firm, or corporation.

*Id.* § 24.2 (emphasis added).

31. "Restricted Party" is defined to include a "Member (whether directly or indirectly through another Person, family member or associate or through any other entity that a member controls, directly or indirectly, or is a member, partner or shareholder of)." *Id.* § 24.1 (a).

32. CRPS and CWE agreed as follows: "Each Member acknowledges that he/she/it has the authority to bind his/her/its applicable Restricted Party to the non-solicitation covenant set forth herein and is liable for any breach of the non-solicitation covenant by his/her/its applicable Restricted Party." *Id.* § 24.2.

33. In addition, CRPS and CWE agreed to abide by a non-competition provision ("Non-Competition Provision") during a "Restricted Period" of, as applicable here, "36 months after [ceasing] to have any Membership Interest in the Company [Wolf]." *Id.* § 24.1(b).

34. CRPS and CWE had Membership Interests in Wolf as of October 31, 2018.

35. The Non-Competition Provision also applies to all the "Restricted Parties" (including each of the Defendants) and states, in part, as follows:

> Except as the same relates to an Exempt Company (as defined in Section 24.7 below), no [Restricted Party] shall directly or indirectly own, manage, operate, finance, control, participate in, advise, render services to or guarantee the obligations of, any business or Person engaged in: (i) the acquisition, holding, exchange and selling of any Oil and Gas Mineral Interest, or (ii) any business activity that comprises 25% or more of the Company's gross revenue, or (iii) any business activities that the Company spends 25% or more of its efforts developing (each, a **"Primary Business Area"**), anywhere that the Company does business or is then engaged in the process of obtaining business (the **"Non-Compete Area"**) including, but not limited to the States of Colorado, Wyoming, Oklahoma, West Virginia, Pennsylvania, North Dakota, South Dakota and any other state that the Company is engaged in or planning to engage in business, as and where each such Primary Business Area exists, now or in the future.

*Id.* § 24.1(a).

36. "Oil and Gas Mineral Interest" is defined to mean "any oil, oil shale, gas, liquid and gaseous hydrocarbons or mineral fee interest, royalty interest, overriding royalty interest, net profits interest, production payment, leasehold interest, non-operating working interest, or other rights or interests in oil, gas or other minerals, of any kind or nature, and the contractual right to acquire any such interest directly or indirectly by farm-out, option, assignment or purchase." *Id.* § 1.15.

37. CRPS and CWE agreed that "in the event he/she/it or a Restricted Party breaches, or threatens to breach, the restrictions set forth in this Section 24 [including the Confidentiality and Non-Competition Provisions set forth above], the Company and the other non-breaching Members would suffer immediate and irreparable harm and damage." *Id.* § 24.4.

38. CRPS and CWE further agreed that "the Company or its successor or assign may, in addition to all other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other equitable relief (without posting a bond or other security) in order to enforce or prevent any violations of the provisions hereof (including, without limitation, the extension of the Restricted Period by a period equal to the duration of the violation of this Section)." *Id.*

39. Further, CRPS and CWE agreed that "the breaching Member shall indemnify and hold the Company harmless from all cost and expense, including reasonable attorneys' fees, incurred due to the breach of this Section by the Restricted Party." *Id.*

### C. Defendants Resign from Wolf and Wolf Discovers Their Theft of Information and Threatened Solicitation and Competition.

40. On November 1, 2018, Defendants resigned from Wolf.

41. Following Defendants' resignations, their counsel stated to Wolf's counsel as follows:

> My clients are arranging to deliver all of the information in their possession pertaining to Wolf Resources, LLC, to your office today. They intend to copy all of it to a flash drive and drop that off at your office during the course of the day.

42. Wolf has discovered through forensic analysis that, prior to their departures, Defendants exfiltrated thousands, if not tens of thousands, of Wolf files, including substantial amounts of Wolf confidential and trade secret documents. Defendants failed to return thousands of these files, despite their representation that they had returned "all of the information in their possession pertaining to Wolf."

43. Defendants removed the documents through various means, including the use of external storage devices, the cloud-based file storage service Dropbox, and by exporting an entire Microsoft Outlook ".pst" file containing thousands of emails, attachments, and other information.

44. Wolf server activity confirms that Defendants read and/or copied hundreds (if not thousands) of files from Wolf servers in the week leading up to their departure.

45. In addition, Derner and CRPS created dozens of PDF files in the week leading up to their departure, suggesting a targeted effort to assemble a collection of Wolf materials to take with them.

46. By way of example, the files taken by Defendants include:

   a. MORs, DTOs, and DOTOs;

   b. Documents concerning Wolf's investors and investment funds;

   c. Proprietary information developed by Wolf concerning the status of oil and gas leases;

   d. Payroll information and personnel files, including private employee information such as social security numbers and driver's license/passport numbers;

   e. Profit and loss and other financial statements related to Wolf;

   f. Deal sheets reflecting pending deals being worked on by Wolf's sales staff; and

   g. Information from Wolf's Salesforce customer relationship management software.

47. Defendants did not possess the above information before they were associated with Wolf and/or its predecessor, and Defendants obtained this information solely through their association with Wolf and/or its predecessor.

48. The above information includes Confidential Information within the meaning of the Operating Agreement.

49. The above information has significant competitive value, and Defendants' theft of the information demonstrates that Defendants plan to violate the Non-Solicitation and Non-Competition Provisions of the Operating Agreement.

50.     Defendants also indicated in a letter to Wolf that they may approach Wolf's customers and lenders in the event various demands they made on Wolf following their resignations were not met.

51.     Moreover, following Defendants' resignations, Defendants' representative stated that "Mr. Derner and Mr. Linton have also met people they know in the oil and gas business who are their friends, for the purpose of maintaining their personal relationships," confirming that Defendants are threatening to solicit Wolf's business relationships and compete against Wolf in violation of the Operating Agreement.

52.     Further confirming the threat posed by Defendants, in late 2016, Linton and CWE diverted a six-figure Wolf business opportunity to CWE, secretly arranging for CWE to purchase certain oil and gas mineral interests in a parcel of land rather than Wolf.

53.     Only when Wolf discovered through public records that Linton and CWE had diverted the deal to CWE, and confronted Linton, did Linton and CWE transfer the interests back to Wolf.

54.     Just last week, Defendants were observed attending the NAPE Summit Week ("NAPE Summit") in Houston, Texas, an event that is described as the "oil and gas industry's marketplace for the buying, selling and trading of prospects and producing properties." Defendants' attendance at the NAPE Summit confirms that they have engaged in threatened and/or actual solicitation of Wolf's business relationships and competition against Wolf. Indeed, in the past, Defendants have solicited and/or obtained business from the NAPE Summit, including on behalf of Wolf.

### D.     CRPS and CWE Are the Alter Egos and Agents of Derner and Linton, Respectively.

55.     Derner organized CRPS and is its sole member.

56.     Derner and CRPS use the same phone number and mobile device.

57.     Derner's home address is the same as CRPS's principal place of business.

58.     Upon information and belief, Derner uses CRPS as a mere vehicle for his personal business dealings.

59.     Indeed, Derner indicated in October 2018 that "Colorado Real Property Solutions LLC just flows right through to our personal tax returns as a single member LLC."

60.     In addition, following Derner's resignation from Wolf, counsel for Defendants sent a demand letter to Wolf seeking wages payable to "Colorado Real Property Solutions, LLC ('CRPS') and/or Cody Derner," reflecting that CRPS and Derner are one and the same.

61.     Accordingly, CRPS and Derner are alter egos of each other and, therefore, Derner is bound by the Operating Agreement.

62.     Linton organized CWE and is its sole member.

63.     Linton and CWE use the same phone number and mobile device.

64.     Linton's home address is the same as CWE's principal place of business.

65.     Indeed, when Linton diverted a Wolf deal to CWE in late 2016, as discussed above, Linton listed his home address as CWE's address on the mineral and royalty deed.

66.     Upon information and belief, Linton uses CWE as a mere vehicle for his personal business dealings.

67.     Accordingly, Linton and CWE are alter egos of each other and, therefore, Linton is bound by the Operating Agreement.

68. In addition, following Linton's resignation from Wolf, counsel for Defendants sent a demand letter to Wolf seeking wages payable to "Core West Energy, LLC ('Core West'), and/or Corey Linton," reflecting that CWE and Linton are one and the same.

69. Further, CRPS and CWE acted as agents of Derner and Linton, respectively, and bound Derner and Linton to the Confidentiality, Non-Solicitation, and Non-Competition Provisions of the Operating Agreement.

70. In the months leading up to their departure, Derner and CRPS, and likely Linton and CWE, repeatedly discussed and recognized their obligations under the Operating Agreement, including in writing.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

71. The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

72. CRPS and CWE entered into the Operating Agreement as set forth above.

73. Derner and Linton entered into the Confidentiality, Non-Solicitation, and Non-Competition Provisions of the Operating Agreement through their alter egos and/or agents, CRPS and CWE, respectively.

74. The Operating Agreement is valid and enforceable.

75. Wolf and its other members have fully performed their obligations under the Operating Agreement.

76. Defendants' actions, as set forth above, constitute actual and threatened breaches of the Operating Agreement, including the Confidentiality, Non-Solicitation, and Non-

- 13 -

Competition Provisions therein.

77. Wolf has no adequate remedy at law for Defendants' actions, and such actions have caused and will cause Wolf real, immediate, and irreparable injury, entitling Wolf to preliminary and permanent injunctive relief.

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets Under 18 U.S.C. § 1836(b))

78. The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

79. Defendants have misappropriated and are threatening to misappropriate the trade secrets of Wolf within the meaning of 18 U.S.C. § 1839(3), and as described above.

80. Defendants' actual and threatened misappropriation of trade secrets has caused and will cause Wolf real, immediate, and irreparable injury.

81. Wolf has no adequate remedy at law to prevent misappropriation, disclosure, or use of its trade secrets, and is entitled to preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A).

## THIRD CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets Under the Colorado Uniform Trade Secrets Act)

82. The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

83. Defendants have misappropriated and are threatening to misappropriate the trade secrets of Wolf as described above and within the meaning of Colo. Rev. Stat. § 7-74-102(4).

84. Defendants' actual and threatened misappropriation of trade secrets has caused and will cause Wolf real, immediate, and irreparable injury.

85. Wolf has no adequate remedy at law to prevent misappropriation, disclosure, or use of its trade secrets, and is entitled to preliminary and permanent injunctive relief pursuant to Colo. Rev. Stat. § 7-74-102(4).

### FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

86. The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

87. As the result of the actions described above, Defendants obtained various benefits, including Wolf's confidential information and trade secrets as set forth above.

88. These benefits were received and obtained at Wolf's expense.

89. Defendants received these benefits without justification and under circumstances that would make it unjust for them to retain those benefits.

90. Defendants' actions have caused and will continue to cause Wolf real, immediate, and irreparable injury, entitling Wolf to preliminary and permanent injunctive relief.

## FIFTH CLAIM FOR RELIEF
### (Tortious Interference with Contract)

91. The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.

92. Each of the Defendants knew or reasonably should have known of the contractual relationship, namely the Operating Agreement, between and among Wolf and the other Defendants.

93. Each of the Defendants intentionally, improperly, through the use of wrongful means, and without justification caused the other Defendants to breach such contractual obligations.

94. Defendants' actions have caused and will continue to cause Wolf real, immediate, and irreparable injury, entitling Wolf to preliminary and permanent injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Wolf respectfully requests that the Court enter judgment in its favor and grant relief as follows:

A. A preliminary and permanent injunction requiring Defendants to return to Wolf all confidential, proprietary, and/or trade secret information and property obtained from Wolf, including all computer files, documents, notes, records, reports, and other papers (and all copies thereof) relating to Wolf's business, and all associated property that Defendants may possess or have under their control and, to the extent the Court does not order Defendants to return Wolf's documents and information pending the completion of this action, to preserve, in their original state, all documents and information in Defendants' possession, custody, or control, or otherwise

available to Defendants, related to the issues set forth in this Complaint, which includes, but is not limited to, hard copy or electronic files of documents, computer files, hard drive data, ambient data, electronic mail messages, voice messages, instant messages, correspondence, and phone logs;

      B.      A preliminary and permanent injunction requiring Defendants to keep confidential and not divulge, communicate, or use to the detriment of Wolf any Confidential Information (as defined above) of Wolf;

      C.      A preliminary and permanent injunction providing that Defendants shall not, directly or indirectly through another person or entity, (i) influence or attempt to influence any of the sellers, buyers, clients, customers, suppliers, licensees, licensors, sponsors, or other business relations of Wolf to divert their business or patronage from Wolf to any other person, or to cease doing business with Wolf, or in any way interfere with the relationship between any seller, buyer, clients, customer, supplier, licensee, licensor, sponsor, or other business relation and Wolf, (ii) make any statement or do any act intended to cause an existing or potential seller or buyer of mineral interests to enter into an agreement with any business competitive to Wolf, or (iii) attempt to or participate in any way, directly or indirectly, in soliciting, inducing, or encouraging any seller, buyer, client or customer, or any prospective seller, buyer, client, or customer, to become a customer or client of any person, firm, or corporation other than Wolf;

      D.      A preliminary and permanent injunction providing that Defendants shall not, in the States of Colorado, Wyoming, Oklahoma, West Virginia, Pennsylvania, North Dakota, and South Dakota, whether directly or indirectly, own, manage, operate, finance, control, participate in, advise, render services to, or guarantee the obligations of, any business or person engaged in:

(i) the acquisition, holding, exchange, and selling of any Oil and Gas Mineral Interest (as defined above), or (ii) any business activity that comprises 25% or more of Wolf's gross revenue, or (iii) any business activities that Wolf spends 25% or more of its efforts developing;

  E. An award of costs and attorneys' fees; and

  F. Such other and further relief as the Court may deem proper and just.

Dated: February 21, 2019     Respectfully submitted,

               */s/ Brett C. Painter*
               Brett C. Painter
               Sterling J. LeBoeuf
               DAVIS GRAHAM & STUBBS LLP
               1550 17th Street, Suite 500
               Denver, CO 80202
               Telephone: 303-892-9400
               Facsimile: 303-893-1379
               Email: brett.painter@dgslaw.com
               Email: sterling.leboeuf@dgslaw.com

               *Attorneys for Wolf Resources, LLC*

<u>Name and Address of Plaintiff</u>:

Wolf Resources, LLC
621 17th Street, Suite 1601
Denver, CO 80293