IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00515-CMA-MEH

WOLF RESOURCES, LLC,

          Plaintiff,

v.

CODY DERNER,
COREY LINTON,
COLORADO REAL PROPERTY SOLUTIONS, LLC, and
CORE WEST ENERGY, LLC,

          Defendants.

---

## CONSOLIDATED ANSWER TO COMPLAINT FOR INJUNCTIVE RELIEF

---

Defendants Cody Derner, Corey Linton, Colorado Real Property Solutions, LLC and Core West Energy, LLC, (collectively "Defendants"), through their undersigned counsel, submit the following Consolidated Answer to plaintiff Wolf Resources, LLC's ("Wolf") Complaint For Injunctive Relief.  Where it can be discerned that the Complaint clearly identifies factual or legal issues that affect a particular Defendant differently than the others, Defendants have made an effort to differentiate their responses, however Defendants are not responsible for any failure of Plaintiff to clearly identify facts or issues that may affect individual Defendants differently than their co-defendants.

### ANSWER TO INTRODUCTION

1.      *Wolf requires the assistance of this Court to protect its business operations and trade secrets. Forensic analysis has confirmed that two former employees and their entities have absconded with thousands of confidential and trade secret files*

*belonging to Wolf, including documents at the very core of Wolf's business of dealing in oil and gas mineral interests, despite their representation that they had returned all Wolf information. And just last week, Defendants attended a major industry conference focused on the exchange of oil and gas mineral interests. Defendants' theft of Wolf's proprietary information, and their involvement in a key industry event, confirms that, in addition to violating their confidentiality restrictions with Wolf, they are violating or will imminently violate their non-solicitation and non-competition restrictions. Wolf will be immediately and irreparably harmed if it does not obtain injunctive relief as requested herein.*

<u>Answer:</u>  Though no response is required to Plaintiff's introductory statement, Defendants state that they may well have in their possession "backup" copies of certain documents belonging to Plaintiff, which they downloaded during the ordinary course of business while working for Plaintiff.  Plaintiff locked Defendants out of the workplace without warning or prior notice, so Defendants could not have engaged in the calculated, planned removal of documents that Plaintiff alleges.  Defendants CRPS and CWE also continue to have rights in the information due to their membership in two companies affiliated with Wolf, as described in Defendants' counterclaims.  However, Defendants have no use for nor any interest in retaining any such documents, and are willing to cooperate with the Plaintiff to ensure that any sensitive documents are properly handled. The non-compete and non-solicitation agreements Plaintiff references are unenforceable under Colorado law, and at a minimum should be reformed by the Court.

ANSWER TO PARTIES, JURISDICTION, AND VENUE

2.      *Wolf is a Colorado limited liability company with its principal place of business at 621 17th Street, Suite 1601, Denver, CO 80293.*

    Answer:  Admit.

3.      *Derner is an individual who resides at 5436 Prentice Circle, Littleton, CO 80123.*

    Answer:  Admit.

4.      *Linton is an individual who resides at 17562 West 77th Drive, Arvada, CO 80007.*

    Answer:  Admit.

5.      *CRPS is a Colorado limited liability company with its principal place of business at 5436 Prentice Circle, Littleton, CO 80123.*

    Answer:  Admit.

6.      *Derner is the sole member of CRPS.*

    Answer:  Admit.

7.      *CWE is a Colorado limited liability company with its principal place of business at 17562 West 77th Drive, Arvada, CO 80007.*

    Answer:  Admit.

8.      *Linton is the sole member of CWE.*

    Answer:  Admit.

9.      *The Court has original jurisdiction over this matter under 28 U.S.C. § 1331, as this action alleges a claim arising under the laws of the United States. The*

*Court has supplemental jurisdiction over the state law claims alleged herein pursuant to
28 U.S.C. § 1367.*

Answer:  Defendants do not contest this Court's subject-matter jurisdiction over
Plaintiff's sole federal claim.  This Court should not exercise its discretion to accept
supplemental jurisdiction over Plaintiff's state law claims unless it also accepts such
jurisdiction over Defendants' state law counterclaims, filed contemporaneously herewith.

10.     *Venue is proper in the District of Colorado pursuant to, inter alia, 28
U.S.C. § 1391(b)(1), because Defendants are residents of Colorado.*

Answer:        Defendants do not contest venue.

GENERAL ALLEGATIONS

11.     *Wolf is a privately-held company engaged in the acquisition, holding,
exchange, and selling of oil and gas mineral interests.*

Answer:        Admit.

12.     *Wolf has invested substantial effort, time, and money in developing and
maintaining its confidential information and trade secrets.*

Answer:        Defendants lack sufficient information to admit or deny the
allegations of paragraph 12, and on that basis deny them.

13.     *Wolf's confidential and trade secret information includes, without
limitation, purchase and sale agreements for mineral interests, lists of information
regarding mineral interest owners, pricing formulas and methods, deal sheets listing
pending deals, and executed subscription agreements.*

<u>Answer</u>:        Deny on the basis of insufficient knowledge regarding what
Plaintiff regards as confidential and whether Plaintiff's claims are justified.

14.    *Wolf's confidential and trade secret information also includes mineral
ownership and leasehold reports ("MORs"), drilling title opinions ("DTOs"), division
order title opinions ("DOTOs"), and related documents.*

<u>Answer</u>:        Deny.  Plaintiff neither drills wells nor pays royalties to any
parties, therefore Wolf has no economic justification to generate its own DTOs or
DOTOs.  However,  DTOs and DOTOs contain detailed title information that is of great
value to a company in the business of conducting mineral transactions.  Plaintiff resolved
this particular dilemma by entering into illegal and corrupt arrangements with employees
of Colorado oil and gas operators to purchase copies of such documents in exchange for
cash payments.  Employees of Plaintiff were sometimes specially tasked with manually
copying the paper DTOs and DOTOs onto Wolf's computer servers, so that Plaintiff
could make use of them.  Mineral Ownership Reports are largely based upon public
information, or in some cases were based on information contained in the illicit DTOs
and DOTOs.

15. *The MORs, DTOs, and DOTOs are the backbone of Wolf's database of
potential deals for oil and gas mineral interests; they provide the key information Wolf
has gathered on mineral interest owners in relevant areas, including verification of the
ownership of the interests and other information. These are the most labor-intensive
documents produced by Wolf, as they frequently require dozens of hours of research,
including travel to remote locations to access county records.*

<u>Answer</u>:        Deny.  Plaintiff acquired the DTOs and DOTOs by illicit means as alleged above.  Use of this illicit information was in part the "backbone" of Wolf's business model.

16.    *To protect and preserve its confidential information and trade secrets, Wolf uses a firewall, antivirus and internet security software, employee activity monitoring software, physical safeguards, and nightly server backups.*

<u>Answer</u>:        Defendants are without sufficient information to admit or deny the allegations of paragraph 16, and on that basis deny them.

17.    *Further, remote access to Wolf systems is granted only to authorized users, and folders on Wolf's server are protected by access/permission rights assigned by Wolf's management team.*

<u>Answer</u>:        Admit, although for context every company with a computer system employs similar safeguards.

18.    *Wolf further protects its confidential information and trade secrets through the use of restrictive covenants and by initiating litigation, such as this lawsuit, when necessary.*

<u>Answer</u>:        Defendants admit that lawsuit, as an intimidation tactic designed to silence Defendants and drive them into economic ruin, is indeed one means Plaintiff has selected to keep its hold on the information it has obtained illicitly from its employees and others.

*19.     Wolf's confidential information and trade secrets provide it with a business advantage over competitors that do not have access to, or knowledge of, the confidential information or trade secrets.*

<u>Answer</u>:     Insufficient knowledge to admit or deny, therefore deny.

*20.     Derner's entity, CRPS, became a member of Wolf in 2017.*

<u>Answer</u>:     Deny.

*21.     Derner had been providing services to Wolf or Wolf's predecessor entity since approximately 2014 and continued to provide services to Wolf when CRPS became a member of Wolf.*

<u>Answer</u>:     Admit as to times prior to the date CRPS became a Member of Wolf.  Deny as to times after CRPS became a Member, because it was unclear whether Wolf considered CRPS, or Derner, or perhaps both, to be the service provider(s), and whether he, it, or they were acting as employee(s) or independent contractor(s) for Wolf, thus Defendants lack sufficient information to admit or deny.

*22.     Linton's entity, CWE, became a member of Wolf in 2017.*

<u>Answer</u>:     Deny.

*23.     Linton had been providing services to Wolf or its predecessor entity since approximately 2014 and continued to provide services to Wolf when CWE became a member of Wolf.*

<u>Answer</u>:     Admit as to times prior to the date CRPS became a Member of Wolf.  Deny as to times after CWE became a Member, because it was unclear whether Wolf considered CWE, or Linton, or perhaps both, to be the service provider(s), and

whether he, it, or they were acting as employee(s) or independent contractor(s) for Wolf,
thus Defendants lack sufficient information to admit or deny.

24.     *While at Wolf, Derner held the title of Vice President of Acquisitions.*

Answer:     Admit as to dates after March 2018.  Defendants interpret
Plaintiff's use of the word "at" as potentially referring either to independent contractor or
employee status.  Derner held this title, yet all payments compensation, to the extent
Wolf made them, were made to CRPS .

25.     *While at Wolf, Linton held the title of Vice President of Asset
Management.*

Answer:     Admit as to dates after March 2018.  Defendants interpret
Plaintiff's use of the word "at" as potentially referring either to independent contractor or
employee status.  Linton held this title, yet all payments of compensation, to the extent
Wolf made them, were made to CWE.

26.     *CRPS and CWE, through Derner and Linton, respectively, signed Wolf's
Third Amended and Restated Operating Agreement ("Operating Agreement"), which is
dated effective March 1, 2018 and is attached hereto as Exhibit A.*

Answer:     Admit.

27.     *Derner and Linton had signed a prior version of the Operating Agreement
in their individual capacities, but Wolf accommodated their request to have the
agreement redrafted so that CRPS and CWE would be signatories.*

Answer:     Admit, and the Operating Agreement could not be more clear on
this point.  It states, on page 1:

{00368566.DOCX / 6 }

**THIS THIRD AMENDED AND RESTATED OPERATING AGREEMENT IS INTENDED TO, AND DOES HEREBY, REPLACE ALL PRIOR VERSIONS OF THE COMPANY'S OPERATING AGREEMENT … WHICH SHALL HAVE NO FURTHER FORCE OR EFFECT.**

Exhibit A to Complaint at 1 (Emphasis in original).

28.    *CRPS and CWE agreed to a confidentiality provision, which defines*

*"Confidential Information" as follows:*

> *Each Member acknowledges and agrees that any and all information, data, know-how, trade secrets (as defined in C.R.S. § 7-74-102(4)), designs or work product acquired, gained, developed or uncovered by the Company during the conduct of the Company's Primary Business (collectively "Confidential Information") is the absolute property of the Company, and the Company is the sole owner of the Confidential Information. The Confidential Information includes, but is not necessarily limited to, mineral deeds, title research, ownership lists, contracts, written files, computer data, financial information, reports, business strategy, and work product.*

*Exhibit A § 24.3.*

    <u>Answer</u>:    Defendants admit the language Plaintiff has quoted appears in the

referenced document, which speaks for itself.

29.    *CRPS and CWE agreed as follows with respect to the Confidential*

*Information:*

> *Each Member acknowledges that to the extent such Member acquires, obtains or has access to any Confidential Information such Member does so in strict confidence and if so requested by the Company after ceasing to be a Member of the Company, such Member shall return all Confidential Information in its possession to the Company. Independent of the termination of this Agreement, each applicable Member shall keep confidential and shall not divulge, communicate or use to the detriment of the Company any Confidential Information. The foregoing shall not apply to information and data that is readily available to the general public, unless such availability is due to such violating Member's*

*actions. This Agreement shall not prohibit or limit the disclosure of Confidential Information that is required to be disclosed under any state or federal laws.*

*Id.*

Answer:    Defendants admit the language Plaintiff has quoted appears in the referenced document, which speaks for itself.

30.    *CRPS and CWE also agreed to an additional confidentiality restriction (this additional restriction, together with the confidentiality provision in Section 24.3, the "Confidentiality Provisions"), as well as a non-solicitation provision ("Non-Solicitation Provision"):*

> *During the Restricted Period, except as the same relate to an Exempt Company, no Member or Restricted Party shall directly or indirectly through another Person (a) influence or attempt to influence any of the sellers, buyers, clients, customers, suppliers, licensees, licensors, sponsors or other business relations of the Company to divert their business or patronage from the Company to any other Person engaged in any of the Company's Primary Business Areas or to cease doing business with the Company, or in any way interfere with the relationship between any seller, buyer, clients, customer, supplier, licensee, licensor, sponsor or other business relation and the Company; (b) disclose to any Person the names, addresses, or requirements of, or other Confidential Information or trade secrets relating to, any of the Company's Primary Business Areas including, but not limited to, the form of purchase or sale agreement for mineral interests, client or customer lists or other information on mineral owners, investors and pricing formulas or methods used in any of the Company's Primary Business Areas; [or] (c) make any statement or do any act intended to cause [an] existing or potential seller or buyer of mineral interests to enter into an agreement with any competitive business…. Specifically, a Member or Restricted Party shall not: . . . (iii) attempt to or participate in any way, directly or indirectly, in soliciting, inducing, or encouraging any seller, buyer, client or customer, or any prospective seller, buyer, client or customer, to become a customer or client of any other person, firm, or corporation. Id. § 24.2 (emphasis added).*

Answer:    Defendants admit the language Plaintiff has quoted appears in the referenced document, which speaks for itself.  Defendants Derner and Linton specifically deny that either of them is a "Restricted Party."

31.    "Restricted Party" is defined to include a "Member (whether directly or indirectly through another Person, family member or associate or through any other entity that a member controls, directly or indirectly, or is a member, partner or shareholder of)." Id. § 24.1 (a).

Answer:    Defendants admit the language Plaintiff has quoted appears in the referenced document, which speaks for itself.  Defendants Derner and Linton specifically deny that either is a "Restricted Party" under this definition.

32.    CRPS and CWE agreed as follows: "Each Member acknowledges that he/she/it has the authority to bind his/her/its applicable Restricted Party to the non-solicitation covenant set forth herein and is liable for any breach of the non-solicitation covenant by his/her/its applicable Restricted Party." Id. § 24.2.

Answer:    Defendants admit the language Plaintiff has quoted appears in the referenced document, which speaks for itself.  Defendants Derner and Linton specifically deny that either is a Restricted Party under this definition.

33.    In addition, CRPS and CWE agreed to abide by a non-competition provision ("Non-Competition Provision") during a "Restricted Period" of, as applicable here, "36 months after [ceasing] to have any Membership Interest in the Company [Wolf]." Id. § 24.1(b).

Answer:      Defendants admit the language Plaintiff has quoted appears in the
referenced document, which speaks for itself.

34.    *CRPS and CWE had Membership Interests in Wolf as of October 31,
2018.*

Answer:      Admit.  CRPS and CWE also held those interests through the close
of business on November 1, 2018, when Plaintiff attempted to lock them out of the
workplace, and may still hold them to this day.

35.    *The Non-Competition Provision also applies to all the "Restricted
Parties" (including each of the Defendants) and states, in part, as follows:*

> *Except as the same relates to an Exempt Company (as defined in
> Section 24.7 below), no [Restricted Party] shall directly or
> indirectly own, manage, operate, finance, control, participate in,
> advise, render services to or guarantee the obligations of, any
> business or Person engaged in: (i) the acquisition, holding,
> exchange and selling of any Oil and Gas Mineral Interest, or  (ii)
> any business activity that comprises 25% or more of the
> Company's gross revenue, or (iii) any business activities that the
> Company spends 25% or more of its efforts developing (each, a
> "Primary Business Area"), anywhere that the Company does
> business or is then engaged in the process of obtaining business
> (the "Non-Compete Area") including, but not limited to the States
> of Colorado, Wyoming, Oklahoma, West Virginia, Pennsylvania,
> North Dakota, South Dakota and any other state that the Company
> is engaged in or planning to engage in business, as and where
> each  such Primary Business Area exists, now or in the future.  Id.
> § 24.1(a).*

Answer:      Defendants admit that the language Plaintiff has quoted appears in
the referenced document, which speaks for itself.  Derner and Linton specifically deny
that they are Restricted Parties under this definition.

36.     "Oil and Gas Mineral Interest" is defined to mean "any oil, oil shale, gas, liquid and gaseous hydrocarbons or mineral fee interest, royalty interest, overriding royalty interest, net profits interest, production payment, leasehold interest, non-operating working interest, or other rights or interests in oil, gas or other minerals, of any kind or nature, and the contractual right to acquire any such interest directly or indirectly by farm-out, option, assignment or purchase." Id. § 1.15.

Answer:      Defendants admit that the language Plaintiff has quoted appears in the referenced document, which speaks for itself.

37.     CRPS and CWE agreed that "in the event he/she/it or a Restricted Party breaches, or threatens to breach, the restrictions set forth in this Section 24 [including the Confidentiality and Non-Competition Provisions set forth above], the Company and the other non-breaching Members would suffer immediate and irreparable harm and damage." Id. § 24.4.

Answer:      Defendants admit that the language Plaintiff has quoted appears in the referenced document, which speaks for itself.

38.     CRPS and CWE further agreed that "the Company or its successor or assign may, in addition to all other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other equitable relief (without posting a bond or other security) in order to enforce or prevent any violations of the provisions hereof (including, without limitation, the extension of the Restricted Period by a period equal to the duration of the violation of this Section)." Id.

<u>Answer</u>:        Defendants admit that the language Plaintiff has quoted appears in the referenced document, which speaks for itself.

39.        *Further, CRPS and CWE agreed that "the breaching Member shall indemnify and  hold the Company harmless from all cost and expense, including reasonable attorneys' fees,  incurred due to the breach of this Section by the Restricted Party." Id.*

<u>Answer</u>:        Defendants admit that the language Plaintiff has quoted appears in the referenced document, which speaks for itself.

40.        *On November 1, 2018, Defendants resigned from Wolf.*

<u>Answer</u>:        Deny.  As to CWE and CRPS, deny on the grounds that this paragraph relies on several legal conclusions and is therefore itself a legal conclusion and not an allegation of fact.  "Resignation" is defined in the Operating Agreement, Exhibit A to the Complaint, at § 1.17.  As to Derner and Linton, deny.  In the weeks leading up to November 1, 2018, Wolf's management and personnel (including, but not limited to Derner and Linton) were having extended discussions regarding the future of the company, and possible restructuring of the parties' interests.  Derner and Linton presented one such scenario on November 1, 2018, only to be told their presentation was deemed a resignation from the company and a lockout from the workplace would be instituted.  However, Derner and Linton never intended to voluntarily sever their relationship with Wolf.  Rather, Plaintiff forcibly locked them out of the premises, without warning or notice, on November 1, 2018.

41.     *Following Defendants' resignations, their counsel stated to Wolf's counsel*
*as follows:*

> *My clients are arranging to deliver all of the information in their*
> *possession pertaining to Wolf Resources, LLC, to your office today. They*
> *intend to copy all of it to a flash drive and drop that off at your office*
> *during the course of the day.*

Answer:        Undersigned counsel made the foregoing statement in an attempt at
compromise and resolution of the dispute between the parties, in a communication that
was clearly protected by FRE Rule 408.  Plaintiff's quotation of that communication in a
pleading is inappropriate.

42.     *Wolf has discovered through forensic analysis that, prior to their*
*departures, Defendants exfiltrated thousands, if not tens of thousands, of Wolf files,*
*including substantial amounts of Wolf confidential and trade secret documents.*
*Defendants failed to return thousands of these files, despite their representation that they*
*had returned "all of the information in their possession pertaining to Wolf."*

Answer:        Deny.  As explained above, "departure" is not a correct
description.  Plaintiff locked Defendants out of the workplace on November 1, 2018, an
event that was not voluntary on the part of Defendants and which came without notice or
warning.  Defendants routinely made use of confidential information while working on
behalf of Plaintiff, and the days, weeks, and months leading up that date were, from their
perspective, no different.  They were engaged in normal, routine work on behalf of
Plaintiff.  Even after November 1, 2018, Plaintiff requested that Defendants continue to
work on behalf of Plaintiff in completing ongoing transactions, for which Defendants
needed to make use of confidential information belonging to Plaintiff.  At the end of the

day, to their knowledge, Defendants have provided copies to Plaintiff of all the

documents they had in their possession after November 1, 2018 as a result of the process

described in paragraph 41 above.

43.    *Defendants removed the documents through various means, including the*

*use of external storage devices, the cloud-based file storage service Dropbox, and by*

*exporting an entire Microsoft Outlook ".pst" file containing thousands of emails,*

*attachments, and other information.*

Answer:    Admit as to factual allegations, however Defendants deny the

implication that the activity described in paragraph 43 was improper.  Again, Defendants

had no foreknowledge or warning that Plaintiff would attempt to lock them out of the

workplace on November 1, 2018.  As a result, in the days, weeks, and months prior to the

lockout Defendants continued to engage in normal, routine practices on behalf of

Plaintiff, which normal routine practices included having access to information on Wolf's

servers and occasionally backing up the files on their computers to separate hard drives or

flash drives.

44.    *Wolf server activity confirms that Defendants read and/or copied*

*hundreds (if not thousands) of files from Wolf servers in the week leading up to their*

*departure.*

Answer:    Defendants are without knowledge or information sufficient to

admit or deny the allegations of paragraph 44, and on that basis deny them.  However,

again, the lockout that occurred on November 1, 2018 came without warning to

Defendants, who as far as they knew were working for Plaintiff up until the moment it

happened. Any such activity described in paragraph 44 was part of Defendants' normal practice while working on behalf of Plaintiff.

45.     *In addition, Derner and CRPS created dozens of PDF files in the week leading up to their departure, suggesting a targeted effort to assemble a collection of Wolf materials to take with them.*

Answer:     Deny. Derner may have created pdf files, again as part of his normal business practice while working on behalf of Plaintiff, and denies the balance of the allegations in paragraph 45.

46.     *By way of example, the files taken by Defendants include:*

> *a. MORs, DTOs, and DOTOs;*
>
> *b. Documents concerning Wolf's investors and investment funds;*
>
> *c. Proprietary information developed by Wolf concerning the status of oil and gas leases;*
>
> *d. Payroll information and personnel files, including private employee information such as social security numbers and driver's license/passport numbers;*
>
> *e. Profit and loss and other financial statements related to Wolf;*
>
> *f. Deal sheets reflecting pending deals being worked on by Wolf's sales staff; and*
>
> *g. Information from Wolf's Salesforce customer relationship management software.*

Answer:     Defendants incorporate their prior responses regarding these documents and files.

47.     *Defendants did not possess the above information before they were associated with Wolf and/or its predecessor, and Defendants obtained this information solely through their association with Wolf and/or its predecessor.*

Answer:        Admit.

48.        *The above information includes Confidential Information within the meaning of the Operating Agreement.*

Answer:        Deny on the basis that this paragraph contains legal conclusions rather than allegations of fact.

49.        *The above information has significant competitive value, and Defendants' theft of the information demonstrates that Defendants plan to violate the Non-Solicitation and Non-Competition Provisions of the Operating Agreement.*

Answer:        Deny.  Some of the information referenced above may have an illicitly-obtained competitive advantage, but Defendants did not commit any "theft" of the information, which they acquired for legitimate reasons while working on behalf of Wolf.  Defendants are ready and willing to either destroy or return the only copies of any truly confidential information they possess to Plaintiff, assuming a reasonable process can be arranged for Defendants to do so and be confident that their cooperation will not simply result in more unreasonable demands, for example this lawsuit.

50.        *Defendants also indicated in a letter to Wolf that they may approach Wolf's customers and lenders in the event various demands they made on Wolf following their resignations were not met.*

Answer:        Deny.  Plaintiff is once again relying upon a settlement communication for its pleadings.  Defendants did not state they would approach Wolf's customers for the purposes of doing mineral transactions with them, and Defendants have no intention of doing so.  Defendants had a legitimate reason to approach Plaintiff's

lender because Defendants Derner and Linton had given personal guarantees for the debts of Plaintiff, so Plaintiff's attempt to lock Defendants out of the workplace raised a genuine issue as to the continuing validity of those guarantees. Both the lender and Plaintiff acceded to this, and the guarantee was thus accordingly terminated by agreement of all the parties.

51.    *Moreover, following Defendants' resignations, Defendants' representative stated that "Mr. Derner and Mr. Linton have also met people they know in the oil and gas business who are their friends, for the purpose of maintaining their personal relationships," confirming that Defendants are threatening to solicit Wolf's business relationships and compete against Wolf in violation of the Operating Agreement.*

Answer:    Deny. Once again, Plaintiff is attempting to make use of a settlement communication, in which Defendants were candid and provided full disclosure as to their intentions and activities, to suggest that those intentions and activities are something altogether different from what they are. Defendants once again object to this misuse of settlement communications.

52.    *Further confirming the threat posed by Defendants, in late 2016, Linton and CWE diverted a six-figure Wolf business opportunity to CWE, secretly arranging for CWE to purchase certain oil and gas mineral interests in a parcel of land rather than Wolf.*

Answer:    Deny. As is evident from Plaintiff's own allegations, Defendant Linton was not party to an agreement with Plaintiff until January 2017, months after this

alleged "Wolf business opportunity" presented itself.  At that time, in late 2016, Linton

was acting as an independent contractor to Wolf and other companies. This particular

transaction was a purchase of approximately 12 net mineral acres at a price of

approximately $2,000 per acre – so not the "six figures" Plaintiff references, though

Plaintiff was at least within an order of magnitude.  Though under no obligation to share

this transaction with others working at Wolf, the hectoring and bullying by Wolf's

Managers led Mr. Linton to share this transaction with Wolf just to keep the peace.

    *53.    Only when Wolf discovered through public records that Linton and CWE*

*had  diverted the deal to CWE, and confronted Linton, did Linton and CWE transfer the*

*interests back  to Wolf.*

    <u>Answer</u>:        See response to paragraph 52 above.  Defendants also affirmatively

state that even after the lockout of November 1, 2018, Defendants referred to Plaintiff

any contacts that came their way regarding deals originating with Wolf, including at least

two lucrative deals, demonstrating the falsity of Plaintiff's claims that Defendants

constitute some kind of threat.  Defendants continued to attempt to work with Wolf after

November 1, 2018 in response to Wolf's requests.  Derner also forwarded a lead to Wolf

and also assisted in closing the "PK Berthoud" deal for Wolf, resulting in approximately

$250,000 of profit to Wolf, in this time frame.

    *54.    Just last week, Defendants were observed attending the NAPE Summit*

*Week  ("NAPE Summit") in Houston, Texas, an event that is described as the "oil and*

*gas industry's  marketplace for the buying, selling and trading of prospects and*

*producing properties."  Defendants' attendance at the NAPE Summit confirms that they*

*have engaged in threatened and/or actual solicitation of Wolf's business relationships
and competition against Wolf. Indeed, in the past, Defendants have solicited and/or
obtained business from the NAPE Summit, including on behalf of Wolf.*

Answer:     Defendants Derner and Linton admit they attended the NAPE
Summit, along with tens of thousands of other energy professionals, and deny the balance
of the allegations of paragraph 54.

55.     *Derner organized CRPS and is its sole member.*

Answer:     Admit.

56.     *Derner and CRPS use the same phone number and mobile device.*

Answer:     Admit.

57.     *Derner's home address is the same as CRPS's principal place of business.*

Answer:     Admit.

58.     *Upon information and belief, Derner uses CRPS as a mere vehicle for his
personal business dealings.*

Answer:     Deny.

59.     *Indeed, Derner indicated in October 2018 that "Colorado Real Property
Solutions LLC just flows right through to our personal tax returns as a single member
LLC."*

Answer:     Defendants are without sufficient information to admit or deny the
allegations of paragraph 59, and on that basis deny them.

60.     *In addition, following Derner's resignation from Wolf, counsel for
Defendants sent a demand letter to Wolf seeking wages payable to "Colorado Real*

*Property Solutions, LLC ('CRPS') and/or Cody Derner," reflecting that CRPS and*

*Derner are one and the same.*

<u>Answer</u>:        Defendants admit that they made this statement in their demand

letter, because Plaintiff has never clarified whether it considers Derner or CRPS to be the

"employee" of Wolf.  The demand letter was written to cover all possible bases, and

Defendants have pled their Counterclaims under the Colorado Wage Claim Act in the

alternative.

*61.        Accordingly, CRPS and Derner are alter egos of each other and,*

*therefore, Derner is bound by the Operating Agreement.*

<u>Answer</u>:        Deny.

*62.        Linton organized CWE and is its sole member.*

<u>Answer</u>:        Admit.

*63.        Linton and CWE use the same phone number and mobile device.*

<u>Answer</u>:        Admit.

*64.        Linton's home address is the same as CWE's principal place of business.*

<u>Answer</u>:        Admit.

*65.        Indeed, when Linton diverted a Wolf deal to CWE in late 2016, as*

*discussed  above, Linton listed his home address as CWE's address on the mineral and*

*royalty deed.*

<u>Answer</u>:        Admit.

*66.        Upon information and belief, Linton uses CWE as a mere vehicle for his*

*personal  business dealings.*

Answer:        Deny.

67.        *Accordingly, Linton and CWE are alter egos of each other and, therefore, Linton is bound by the Operating Agreement.*

Answer:        Deny.

68.        *In addition, following Linton's resignation from Wolf, counsel for Defendants sent a demand letter to Wolf seeking wages payable to "Core West Energy, LLC ('Core West'), and/or Corey Linton," reflecting that CWE and Linton are one and the same.*

Answer:        Defendants admit that they made this statement in their demand letter, because Plaintiff has never clarified whether it considers Linton or CWE to be the "employee" of Wolf.  The demand letter was written to cover all possible bases.

69.        *Further, CRPS and CWE acted as agents of Derner and Linton, respectively, and bound Derner and Linton to the Confidentiality, Non-Solicitation, and Non-Competition Provisions of the Operating Agreement.*

Answer:        Deny.

70.        *In the months leading up to their departure, Derner and CRPS, and likely Linton and CWE, repeatedly discussed and recognized their obligations under the Operating Agreement, including in writing.*

Answer:        Deny.

FIRST CLAIM FOR RELIEF
(Breach of Contract)

71.        *The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.*

Answer:      Defendants incorporate their prior responses.

72.     *CRPS and CWE entered into the Operating Agreement as set forth above.*

Answer:      Deny on the basis that this paragraph only asserts a legal conclusion and not an allegation of fact.

73.     *Derner and Linton entered into the Confidentiality, Non-Solicitation, and Non- Competition Provisions of the Operating Agreement through their alter egos and/or agents, CRPS and CWE, respectively.*

Answer:      Deny on the basis that this paragraph only asserts a legal conclusion and not an allegation of fact.

74.     *The Operating Agreement is valid and enforceable.*

Answer:      Deny on the basis that this paragraph only asserts a legal conclusion and not an allegation of fact.

75.     *Wolf and its other members have fully performed their obligations under the Operating Agreement.*

Answer:      Deny.

76.     *Defendants' actions, as set forth above, constitute actual and threatened breaches of the Operating Agreement, including the Confidentiality, Non-Solicitation, and Non- Competition Provisions therein.*

Answer:      Deny on the basis that this paragraph only asserts a legal conclusion and not an allegation of fact.

77.    *Wolf has no adequate remedy at law for Defendants' actions, and such actions have caused and will cause Wolf real, immediate, and irreparable injury, entitling Wolf to preliminary and permanent injunctive relief.*

Answer:    Deny on the basis that this paragraph only asserts a legal conclusion and not an allegation of fact.

SECOND CLAIM FOR RELIEF
(Misappropriation of Trade Secrets Under 18 U.S.C. § 1836(b))

78.    *The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.*

Answer:  Defendants incorporate their prior responses.

79.    *Defendants have misappropriated and are threatening to misappropriate the trade secrets of Wolf within the meaning of 18 U.S.C. § 1839(3), and as described above.*

Answer:    Deny.

80.    *Defendants' actual and threatened misappropriation of trade secrets has caused and will cause Wolf real, immediate, and irreparable injury.*

Answer:    Deny.

81.    *Wolf has no adequate remedy at law to prevent misappropriation, disclosure, or use of its trade secrets, and is entitled to preliminary and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A).*

Answer:    Deny.

THIRD CLAIM FOR RELIEF
(Misappropriation of Trade Secrets Under the Colorado Uniform Trade Secrets Act)

82.    *The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.*

<u>Answer</u>:        Defendants incorporate their prior responses.

83.    *Defendants have misappropriated and are threatening to misappropriate the trade secrets of Wolf as described above and within the meaning of Colo. Rev. Stat. § 7-74-102(4).*

<u>Answer</u>:        Deny.

84.    *Defendants' actual and threatened misappropriation of trade secrets has caused and will cause Wolf real, immediate, and irreparable injury.*

<u>Answer</u>:        Deny.

85.    *Wolf has no adequate remedy at law to prevent misappropriation, disclosure, or use of its trade secrets, and is entitled to preliminary and permanent injunctive relief pursuant to Colo. Rev. Stat. § 7-74-102(4).*

<u>Answer</u>:        Deny.

FOURTH CLAIM FOR RELIEF
(Unjust Enrichment)

86.    *The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.*

<u>Answer</u>:        Defendants incorporate their prior responses.

87.    *As the result of the actions described above, Defendants obtained various benefits, including Wolf's confidential information and trade secrets as set forth above.*

<u>Answer</u>:        Deny.

88.     *These benefits were received and obtained at Wolf's expense.*

Answer:     Deny.

89.     *Defendants received these benefits without justification and under circumstances that would make it unjust for them to retain those benefits.*

Answer:     Deny.

90.     *Defendants' actions have caused and will continue to cause Wolf real, immediate, and irreparable injury, entitling Wolf to preliminary and permanent injunctive relief.*

Answer:     Deny.

FIFTH CLAIM FOR RELIEF
(Tortious Interference with Contract)

91.     *The preceding allegations of the Complaint are incorporated by reference as though set forth fully herein.*

Answer:     Defendants incorporate their prior responses.

92.     *Each of the Defendants knew or reasonably should have known of the contractual relationship, namely the Operating Agreement, between and among Wolf and the other Defendants.*

Answer:     Admit.

93.     *Each of the Defendants intentionally, improperly, through the use of wrongful means, and without justification caused the other Defendants to breach such contractual obligations.*

Answer:     Deny.

*94.       Defendants' actions have caused and will continue to cause Wolf real, immediate, and irreparable injury, entitling Wolf to preliminary and permanent injunctive relief.*

<u>Answer</u>:        Deny.

**DEFENDANTS DENY ANY ALLEGATION OF FACT NOT EXPRESSLY ADMITTED ABOVE.  DEFENDANTS DO NOT RESPOND TO THE PRAYER FOR RELIEF ON THE GROUND THAT NO RESPONSE IS REQUIRED, BUT DENY THAT PLAINTIFF IS ENTITLED TO ANY RELIEF.  DEFENDANTS DO NOT RESPOND TO THE SUBJECT HEADINGS AND TITLES IN THE COMPLAINT AS SUCH ARE NOT ALLEGATIONS OF FACT.**

AFFIRMATIVE DEFENSES

1.       Plaintiff's Complaint fails to state a claim upon which relief can be granted.

2.       Plaintiff's claims are barred or limited to the extent defendants are "whistleblowers" under the Defend Trade Secrets Act of 2016.

3.       Plaintiff's claims are barred or limited by applicable statutes of limitations.

4.       Plaintiff's claims are barred or limited by equitable doctrines of laches, waiver, and unclean hands.

5.      Plaintiff's claims are barred or limited by its failure to mitigate damages.

6.      Plaintiff's claims are barred or limited to the extent the non-compete, non-solicitation, and confidentiality provisions of the Operating Agreement are void or subject to Court reformation as being unreasonable restraints of trade or otherwise as against public policy.

7.      Plaintiff's claims are barred or limited by material failure of consideration.

8.      Plaintiff's claims are barred or limited by Plaintiff's fraudulent conduct in inducing the agreements Plaintiff relies upon, Plaintiff's breach of those agreements, and fraud in the performance of those agreements.

## JURY DEMAND

Defendants hereby demand a jury trial as to all matters so triable.

WHEREFORE, having fully answered the allegations contained in the Complaint, Defendants respectfully request that the Court dismiss the within action, that plaintiff take nothing thereby, award defendants their reasonable costs and attorney's fees incurred in responding to the Complaint, and such other and further relief as the Court deems just and proper.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00515-CMA-MEH

WOLF RESOURCES, LLC,

        Plaintiff,

v.

CODY DERNER,
COREY LINTON,
COLORADO REAL PROPERTY SOLUTIONS, LLC, and
CORE WEST ENERGY, LLC,

        Defendants.

---

## COUNTERCLAIMS OF DEFENDANTS

---

Defendants, by and through counsel, for their Counterclaims against Plaintiff, state as follows. For ease of reference, counterclaim plaintiffs Derner, Linton, Colorado Real Property Solutions, LLC ("CRPS") and Core West Energy, LLC ("CWE") shall be referred to individually or as "Defendants," and counterclaim defendant Wolf Resources, LLC shall be referred to "Wolf" or as "Plaintiff."

### INTRODUCTION

1.      Defendants bring Counterclaims against Plaintiff sounding in breach of contract, the Colorado Wage Claim Act, unjust enrichment, fraud, and declaratory judgment. In this "business divorce," Plaintiff is playing the role of a particularly abusive ex-spouse. Plaintiff locked Defendants out of the workplace on November 1, 2018 without any warning or prior notice. Defendants seek recovery for Plaintiff's failure to

compensate them properly for work they did, for Plaintiff's fraud, statutory penalties, and other damages.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff and counterclaim defendant is a Colorado limited liability company with its principal place of business at 621 17th Street, Suite 1601, Denver, CO 80293.

3.      Defendant and counterclaim plaintiff Derner is an individual who resides at 5436 Prentice Circle, Littleton, CO 80123.

4.      Defendant and counterclaim plaintiff Linton is an individual who resides at 17562 West 77th Drive, Arvada, CO 80007.

5.      Defendant and counterclaim plaintiff CRPS is a Colorado limited liability company with its principal place of business at 5436 Prentice Circle, Littleton, CO 80123.

7.      Defendant and counterclaim plaintiff CWE is a Colorado limited liability company with its principal place of business at 17562 West 77th Drive, Arvada, CO 80007.

8.      The Court has original jurisdiction over one or more claims asserted by Plaintiff in this action, and supplemental jurisdiction over the state law counterclaims alleged herein pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in the District of Colorado pursuant to, inter alia, 28 U.S.C. § 1391(b)(1), because Plaintiff and Defendants are residents of Colorado.

10.     The Operating Agreement at issue herein contains an arbitration clause.
However, Defendants' Counterclaims alleged herein are non-arbitrable because, among
other reasons: (1) they concern payment and non-payment of commissions for work done
by Defendants as employees of Wolf, and the Operating Agreement does not concern,
address, or encompass any matters relating to compensation; (2) the fraud claims alleged
herein also pertained to promised compensation and other benefits of employment, and
therefore also fall outside of the Operating Agreement; and (3) Colorado contract law
requires that Wolf must establish its own compliance with the Operating Agreement in
order to be able to enforce its terms, therefore these Counterclaims, to the extent they
assert violations of the Operating Agreement, properly belong in an action brought to
enforce the non-compete and confidentiality provisions of the Operating Agreement,
which is how Plaintiff has characterized its claims.

## GENERAL ALLEGATIONS

**A.      The genesis of Wolf Resources.**

11.     Wolf Resources ("Wolf") was formed in April 2015 by Kevin Conners.
Another co-owner joined the company soon thereafter.

12.     Linton and Derner had both worked with Conners previously.  Linton and
Derner worked as contract landmen, performing title work, contract negotiation, sales,
marketing, and acquisition work for a number of Colorado oil and gas companies.

13.     Derner became a Member of Wolf and acquired an ownership interest in
the company in early to mid- 2016.  Linton became a Member in January 2017.  A fourth
Member, Matt Ritter, acquired his ownership interest in early 2016 as well.  In 2017, the

Membership was divided as 40% each to Ritter and Conners, and 10% each to Linton and Derner. Wolf also formed a holdings company to "bank" acreage acquired in 2017. The same 40-40-10-10 ownership split was applied to Wolf Resources Holding I, LLC, as the new company was called.

14.     In 2017, Derner and Linton began working nearly exclusively for Wolf. Between them, transactions by Derner and Linton accounted for roughly 80% of Wolf's profits for 2017.

15.     While members of Wolf, Derner and Linton were compensated on a commission basis. If Wolf elected to hold a mineral acreage that either Derner or Linton had acquired, the commission was 25% of the gross spread between the price paid to acquire the acreage compared to its value as calculated by the company. If Wolf sold the acreage to another party, Derner or Linton would be paid 25% of the gross profit that Wolf realized from the deal. If Derner and Linton worked together on a deal, they would share the commission between them at their own discretion.

**B.     Wolf faces financial problems and re-structures.**

16.     In July and August 2017, Linton closed a deal known within Wolf as the Wilson College deal. This was an acquisition of over 6,500 net mineral acres in Laramie County, Wyoming. To this day, Wolf has refused to pay Linton a commission of any kind for this deal, even though the majority of the acreage has been sold for profit, and even though Wolf received a six-figure lease bonus from an oil and gas operator in April 2018. Wolf has always claimed, falsely, that it simply lacks the cash to pay this commission.

17.     Immediately following the Wilson College deal closing and sell-down of 68% of the asset in order to lower the cost basis and increase profit for Wolf, in August 2017, Conners and Ritter arbitrarily increased their salary compensation by 25% and subsequently distributed $1,000,000.00 from Wolf's operating account to the Members in their respective percentages, giving Conners and Ritter each $400,000.00.

18.     After the large distribution of cash and with Wolf's financial health decreasing rapidly, in late 2017, Derner and Linton proposed a different compensation structure with the goal of returning Wolf to financial stability.

19.     The two landmen proposed reducing their commissions to 15% of the net profits (not gross).  They also proposed formation of another holdings company, Wolf RH2, LLC, which would hold all acreage that Wolf decided to "bank" from all 2018 transactions.  The ownership of Wolf RH2 would be equal shares of 25% for each of the four Members.  Finally, Linton and Derner proposed a "secondary" commission whereby they would train and supervise all of Wolf's junior landmen, would receive a reduced commission on deals closed by those junior personnel as compensation.  Linton and Derner had previously done this work without compensation.

20.     Since 2016, despite Derner and Linton's additional roles as Acquisitions Managers responsible for Wolf's only source of profit, they were never paid any type of compensation for their multiple job roles in addition to executing their own personal mineral deals as landmen.

21.     After much reluctance and delay, Conners and Ritter agreed to Linton and Derner's proposal, only to renege on it later as became a habitual pattern.  Conners and

Ritter were named Managers of all three Wolf entities, after Wolf RH2 was, after much delay, finally formed.

22.     Wolf failed to pay any of the promised "secondary" commissions for the fourth quarter of 2017 or for January 2018, even though Derner and Linton both earned such commissions and were entitled to them.  These commissions remain unpaid to this day.

23.     Ritter and Conners also delayed the formation of Wolf RH2 until February 2018, and did not begin to hold mineral acreage in the company until sometime thereafter.

24.     In March 2018, Wolf restructured so that CRPS and CWE replaced Derner and Linton as Members.  Simultaneously, Conners and Ritter also transferred their personal ownership to companies they created and operated.  The 40-40-10-10 division of ownership was retained, with the entities of Conners and Ritter owning the lion's share of the company and continuing to act individually as Managers.  Similar changes were made to Wolf Resources Holding I, LLC and Wolf RH2, LLC.

**C.     The non-competition, non-solicitation, and confidentiality provisions of the Wolf Operating Agreement.**

25.     The LLC Operating Agreement the parties agreed to on March 1, 2018, contained non-competition, non-solicitation, and confidentiality requirements in Article 24 of the agreement (see, Exhibit 1 to Plaintiff's Complaint for Injunctive Relief).

26.     Article 24 imposes obligations upon any Member or any Restricted Party, which is defined as a party that a Member is using to engage in activity violative of Article 24's restrictions.

27.     Only CRPS and CWE are members of Wolf, and Derner and Linton, as the sole members of those entities, are not Restricted Parties.

28.     Article 24 purports to prohibit CRPS and CWE from engaging in the oil and gas business for 3 years after their relationship with Wolf has terminated, and to do so in virtually every oil and gas producing state in America.

29.     Wolf has never done business in several of the states listed in Article 24, has attempted one or two transactions in many of the others, and state-by-state exclusions from competition are unreasonable and overreaching in any event.  Wolf's primary if not only area of activity is in certain parts of the Wattenberg Field in Colorado.

30.     During the entire operation of Wolf, both Conners and Ritter engaged in direct competition with Wolf, using other entities that they had formed.  For example, Kevin Conners continually did oil and gas transactions in Colorado using his entity, Conners Oil and Gas, LLC, competing directly with Wolf regarding land and title brokerage, oil and gas leasing, and mineral buying in Weld County, Colorado.  Conners continues to compete directly with Wolf to this day.

**D.     Wolf promises continued commission payments to its Members – and then reneges.**

31.     At the time CRPS and CWE were made Members of the three Wolf entities, Ritter and Conners expressly promised Derner and Linton that the compensation

agreement reached in late 2017 would continue, and that their LLC entities would receive

payments of sales commissions resulting from transactions they worked on for Wolf's

benefit.

32.    In forming the new Wolf entity, the Managers never clarified two things:

(a)  whether any of Defendants were "employees" of Wolf or if they were instead

independent contractors, or (b) whether the individuals, or the LLCs, were the correct

parties to classify either way.

33.    After March 2018, Wolf cut checks for commission payments, when it

paid them, to CRPS or CWE, and not to Derner or Linton personally.

34.    At the end of May 2018, Conners and Ritter expressed to Linton and

Derner that they were unhappy with the amount of compensation the landmen were

receiving for deals they closed for Wolf as well as the agreement they made with Linton

and Derner on forming Wolf RH2, LLC and the secondary commission structure.  The

Managers stated they would not pay commissions – in any amount – on several deals

Linton and Derner had closed, including the "Cavanaugh" deal which was an extremely

profitable deal for Wolf, netting over $1.1 Million in profit.

35.    The Managers eventually promised they would pay reduced commissions

(roughly half of what normal commissions were) and would allocate a total of $1.1

Million to Wolf RH2 to purchase and hold mineral acreage for 2018.

36.    However, the Managers again reneged on this promise, allocating roughly

a third of that amount to Wolf RH2.  As a result, those assets instead were diverted to

Wolf Resources Holding I, LLC, increasing the Managers' share of ownership over the

assets by 30 percentage points, and creating a nearly seven figure increase for the

Manager's in asset value, while costing CRPS and CWE hundreds of thousands of dollars

in decreased asset value.

37.     The Managers then refused to pay some of even the reduced commissions

that they had promised.

**E.     The use of confidential information within the company.**

38.     The Operating Agreement references confidential information, however

the Managers never identified specifically what information they deemed confidential.

No documents provided to Derner or Linton was labeled as "confidential" or in any

similar manner.

39.     During this time, Derner and Linton performed work using computers the

company supplied them.

40.     Wolf had no centralized backup for computer files other than its own

servers, so employees of Wolf would frequently back up their computer files onto

separate hard drives or flash drives in order to retain copies in the event of server failure

or non-access.

41.     Linton and Derner followed this practice, backing up their computer files

to separate hard drives, drop box files, and flash drives.  This activity was a routine,

normal part of their business practice.  Because Wolf did not differentiate between

confidential and non-confidential documents, confidential documents may have been

included in this backup activity.

**F.      Ritter and Conners lock out the minority owners.**

42.      In September 2018, Ritter began making demands for a larger equity share of Wolf to Conners without any of the other Members involved.  Conners was inclined to accede to this, but his wife, Jill Conners, opposed the idea and stepped in.  Ritter had on numerous occasions told Linton and Derner, as well as other members of the executive team, "I believe Kevin will do anything I want."

43.      After multiple meetings without the minority Members involved, Mrs. Conners informed Linton and Derner of the serious situation in which Ritter was secretly trying to gain more control of Wolf by manipulating Conners, the other Manager. Mr. and Mrs. Conners then asked Linton and Derner for input regarding ideas for how to structure the company in the event that Ritter decided to leave, or if Ritter could be forced out of the company by the other owners.

44.      Ritter threatened Mr. and Mrs. Conners that he would do the following if they did not accede to his demands: Take Wolf's  main source of financing away completely, take the two working interest funds Wolf WI Fund I, LLC and Wolf Energy Partners II, LLC for himself, both entities of which were valued at over $13,000,000, and that he would also need Article 24 (Non-Compete and Non-Solicitation) completely waived so that he could continue to compete with Wolf, mainly in Weld County, Colorado.

45.      As the situation escalated in October 2018, Kevin Conners began asking senior executives at Wolf if they intended to remain with the company or to depart with Matt Ritter if he decided to leave. For example, Conners interrupted a lunch to ask Wolf

CFO Tim Krebs directly if he would be leaving with Ritter.  He then asked if Krebs believed that Wolf needed Ritter to succeed. Conners followed that up by asking Wolf COO Travis Low, on multiple occasions if he thought Wolf needed Ritter to succeed; and further asked both Krebs and Low if they would tell Ritter in a face-to-face meeting that they did not prefer Ritter to be a direct part of Wolf going forward.

46.     Conners further requested that Derner and Linton speak with an attorney regarding options for Ritter not remaining with Wolf; and from there learned that the other owners could not force Ritter to leave without dissolving the company.

47.     In a series of meetings over several days in mid-October 2018, the ownership team continued to discuss the future of the company.  Linton and Derner stated to Ritter that they believed Ritter was not entitled to a larger ownership percentage due to his lack of oil and gas experience and personal management style.  The two landmen wanted a more experienced leader to take control of the company.

48.     At an all-members meeting on October 29, 2018, attended by Ritter, the two Conners, Derner, and Linton, Ritter and Kevin Conners proposed formation of "newco," in which the ownership split would be 31% for each of Ritter and Conners, 7.75% each for Derner and Linton, and the remaining percentage to be divided among other senior employees.  In a reversal of the last 1-2 months of tense dispute, Ritter and Conners announced that they were moving forward with Ritter still a main part of the company, and announced that they would be co-CEO's.  After this announcement, Ritter stated to Derner and Linton that "you guys need to figure out if this will work for you or not."

49.     On November 1, 2018, the owners met again.  Derner and Linton stated that they were shocked and dissatisfied with the proposal from October 29, 2018.  They stated there were professional differences among the company owners, and that it may be in everyone's best interest to see what an exit would look like for them.  Derner and Linton did not say they were resigning from the company, or propose any specific exit scenario.  After asking several questions, Ritter and Conners ended the meeting.  Derner and Linton returned to their offices and continued working on current transactions.

50.     Later that day, without notice, Ritter confronted Derner and Linton while they were working and pulled them into a back conference room at Wolf where additionally Jill Conners and Travis Low sat waiting. Kevin Conners was not a part of this meeting and had no knowledge that this meeting was occurring. Ritter closed the door and demanded that Derner and Linton immediately send Ritter, Mrs. Conners and Travis Low emails from their mobile phones stating that Derner and Linton were resigning from Wolf effective immediately.  Derner and Linton did not agree to do so. Ritter demanded two more times that Derner and Linton send him an email in writing confirming their resignation from Wolf. After Derner and Linton refused, and asked why, Ritter told them that it was simply because he did not want them to file unemployment against Wolf. After Derner and Linton further refused to put a resignation in writing to Ritter and the company, Ritter said he would send one for them stating their resignation, which he did.  Ritter then demanded return of Derner and Linton's keys, computers, and access cards, and that they were to take their personal belongings and leave immediately without telling anyone.

51.     After November 1, 2018 and following an all-company meeting, employees of Wolf contacted Derner and Linton to ask for assistance with ongoing deals that were headed towards closing.

52.     Derner and Linton assisted as best they could for the benefit of Wolf, but did not have access to all of the necessary information and could not meet face-to-face with any Wolf employees.

53.     Ritter also requested by email that Derner and Linton continue to work on transactions that were under contract but not yet closed.  He stated he would draft up an agreement that would cover their compensation and other issues relating to this activity.

54.     Ritter never did so. Subsequently, as is the trend for them, Wolf refused, and has continued to refuse compensating Derner and Linton for deals and work done prior to November 1, 2018, as well as the time after November 1, 2018 in which they were still working on deals for the full benefit of Wolf.

55.     Derner and Linton attempted on numerous occasions before the end of 2018 to communicate with either Ritter or Conners concerning the status of this agreement.

56.     Derner and Linton both attempted to continue to assist Wolf.  For example, each referred numerous contacts to Wolf from parties that had worked with them previously, including one profitable transaction.  Derner and Linton told the parties that their relationship with Wolf was uncertain, and that the parties were better off contacting Wolf directly rather than trying to continue to work through the landmen.

57.     The parties made an attempt at resolving their disputes.  Derner and Linton returned to Wolf, through counsel, copies of all documents belonging to Wolf that they had in their possession.

58.     Derner and Linton have no use for, nor any interest in retaining any confidential information belonging to Wolf, and are willing to return such information to Wolf or delete it.  The process of doing so is complicated by the fact that Derner and Linton backed up some of their personal business files, as well as files for CRPS and CWE, onto those same hard drives.  Defendants do not contest, however, that Wolf is entitled to return or destruction of any Wolf documents deemed to be confidential.

59.     Wolf has never specified which documents or information it deems confidential.

60.     On November 26, 2018, Defendants received a letter from Wolf's counsel advising them that their relationship with Wolf had been terminated, and stating falsely that they had resigned from the company.

61.     All conditions precedent to the bringing of the following causes of action have occurred or been discharged.

**CAUSES OF ACTION**
**First Claim for Relief:  Breach of Contract**

62.     Defendants incorporate their prior allegations as if set forth in full herein.

63.     Plaintiff and Defendants are parties to an employment agreement.  This contract included express agreements by Plaintiff to pay sales commissions to Defendants, both verbal ad written.

64.     Plaintiff has breached one or more of the parties' agreements by refusing to pay agreed commissions to Defendants.

65.     Plaintiff has also breached the parties' agreements by diverting assets away from Wolf RH2, LLC and into Wolf Resources Holding I, LLC instead.

66.     Plaintiff also breached the Wolf Operating Agreement by failing to liquidate Defendants' Capital Accounts and pay the amounts owed as required by the agreement.

67.     Defendants substantially fulfilled their part of the contracts pertaining to those commissions and asset allocations, and are entitled to receive the full benefits thereof.

68.     Defendants are entitled to specific performance of the agreement to allocate all assets acquired in 2018 to Wolf RH2, LLC.

69.     Plaintiff's actions have caused Defendants damages, including damages to Defendants' credit, in an amount to be proven at trial, estimated to be in excess of $3,210,979.00.

**Second Claim for Relief:  Wage Claim Act Violations under C.R.S. § 8-4-101 et seq.**

70.     Defendants incorporate their prior allegations as if set forth in full herein.

71.     Derner and Linton (or, in the alternative, CRPS and CWE) were "employees" of Wolf at all times relevant herein.

72.     Wolf has failed to pay agreed commissions upon termination of Defendants' employment in spite of demand to do so.

73.     Wolf has also failed to compensate Defendants for self-employment taxes they paid on the understanding that they were working as independent contractors and not as employees.

74.     Defendants are entitled to payment of all unpaid commissions plus penalties, interest, and attorneys' fees, all in amounts to be proven at trial.

### Third Claim for Relief:  Unjust Enrichment

75.     Defendants incorporate their prior allegations as if set forth in full herein.

76.     As the result of the actions described above, Plaintiff obtained various benefits, including financial profits earned on mineral transactions that Defendants obtained for Plaintiff.

77.     These benefits were received and obtained at Defendants' expense of time, effort, and labor.

78.     Plaintiff received these benefits without justification and under circumstances that would make it unjust for it to retain those benefits.

79.     Plaintiff's actions have caused and will continue to cause Defendants damages in an amount to be proven at trial.

### Fourth Claim for Relief:  Fraud in the Factum and in the Inducement

80.     Defendants incorporate their prior allegations as if set forth in full herein.

81.     Plaintiff made a false representation of a past or present fact, namely its intent to pay sales commissions and allocate assets among the three Wolf entities as it promised.  At the time the promises were made, Plaintiff had no intention of ever making good on its promises.

82.     Those promises were material.

83.     At the time the promises were made, Plaintiff knew it had no intention of ever keeping them, or was aware that it did not know whether it could keep them.

84.     Plaintiff made its promises with the intent that the Defendants would rely upon them.

85.     In addition, Plaintiff made the promises specifically to, among other things, induce CRPS and CWE to enter into the Wolf Operating Agreement, and for Derner and Linton to sign the Operating Agreement on behalf of their LLC entities.

86.     Defendants relied upon Plaintiff's promises.

87.     Defendants' reliance was justified.

88.     To the extent that Wolf or its Managers owed the minority owners a fiduciary duty, the misrepresentations and broken promises of Plaintiff constitute constructive fraud.

89.     Defendants' reliance caused damages to Defendants in an amount to be proven at trial, in addition to potential punitive damages to the extent discovery establishes Plaintiff's conduct to have been willful, wanton, or malicious in its intent.

**Fifth Claim for Relief:  Declaratory Judgment**

90.     Defendants incorporate their prior allegations as if set forth in full herein.

91.     A genuine controversy within the jurisdiction of this Court exists between Defendants and Plaintiffs regarding the scope of the obligations created by Article 24 of the Wolf Operating Agreement, specifically regarding non-competition, non-solicitation, and confidentiality.

{00368566.DOCX / 6 }

92.     The controversy includes:

a.     Whether the non-competition provision is void as against Colorado public policy in its entirety;

b.     Whether the provisions apply to Derner and Linton as individuals who are not signatories in their individual capacity to the Operating Agreement;

c.     Whether any aspect of Article 24 may be enforced by Plaintiff in light of Plaintiff's fraud and failure to perform under that and interrelated agreements as alleged herein; and

d.     Whether the Court should reform or limit the unreasonable, onerous and unduly burdensome geographic and temporal scope of the Article, which extends to virtually every oil-and-gas producing state including several states where Wolf has never done and may never do business, and for a period of three years.

93.     A declaratory judgment will fully and finally resolve the uncertainty and controversy between the parties related to these issues.

94.     All facts necessary for a decision on these issues are presently determinable by this Court.

95.     Defendants are entitled to a declaration by the Court that:

a.     The non-competition provisions of Article 24 are unenforceable;

b.     Article 24 cannot be enforced against Derner or Linton personally;

c.     Plaintiff is not entitled to enforcement of Article 24 due to its own fraudulent conduct and material breaches of the Operating Agreement and interrelated agreements; and

      d.     Article 24 imposes unreasonable restrictions on trade due to its expansive geographic and temporal reach, and therefore must be limited in accordance with principles of commercial reasonableness.

**PRAYER FOR RELIEF**

Wherefore, based upon the foregoing, Defendants pray for the following relief:

(1)     Contract damages arising from Plaintiff's breach of the parties' agreements;

(2)     Unpaid past commissions, penalties, interest, self-employment taxes, and attorney fees as provided by C.R.S. § 8-4-101 et seq.

(3)     Actual damages caused by Defendants' reasonable reliance upon Plaintiff's promises to pay sales commissions and allocate assets among the three companies in which the parties hold interest;

(4)     In the alternative, specific performance requiring Plaintiff to convey all 2018 mineral transactions from Wolf Resources Holding I, LLC to Wolf RH2, LLC;

(5)     Punitive damages sufficient to punish and deter the deceitful conduct of Plaintiff; and

(6)     Declaratory judgment as described herein.

**JURY DEMAND**

Defendants hereby demand a jury trial as to all matters so triable.

Dated:  April 8, 2019.

Respectfully submitted,

CARVER SCHWARZ MCNAB KAMPER
& FORBES, LLC

/s/*Christopher M. Kamper*, signature on file
By:_____
     Christopher M. Kamper
     1888 Sherman Street
     Suite 400
     Denver, CO 80203
     Phone:  303-893-1815
     Email: ckamper@csmkf.com

Attorneys for Defendants

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on April 8, 2019 I served the foregoing via the CM/ECF system to:

Brett C. Painter, Esq.
Sterling J. LeBoeuf, Esq.
Davis Graham & Stubbs LLP
1550 17th Street — Suite 500
Denver, Colorado 80202

                */s/ Christopher Kamper*
               _____